1                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK

2

3  ---------------------------------X
                             :

4  G.S., a minor under the age of 18,:
  by her father and natural        :

5  guardian, Morris S.,          :
                           : 15-CV-3086 (ARR)

6               Plaintiff,   :
                           : January 29, 2016

7             v.            :
                           : Brooklyn, New York

8  CONGREGATION LEV BAIS YAAKOV,    :
  et al.,                   :

9                           :
               Defendants.   :

10 ---------------------------------X

11      TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
        BEFORE THE HONORABLE RAMON E. REYES, JR.

12           UNITED STATES MAGISTRATE JUDGE

13

   APPEARANCES:

14

   For the Plaintiff:         ROBERT JOSEPH TOLCHIN, ESQ.

15                      The Berkman Law Offices
                      111 Livingston Street

16                      Brooklyn, New York 11201

17

18

   For the Defendants:        DAVID SCOTT RUTHERFORD, ESQ.

19                      Rutherford & Christie, LLP
                      800 Third Avenue

20                      New York, New York 10022

21

   Court Transcriber:         SHARI RIEMER, CET-805

22                      TypeWrite Word Processing Service
                      211 N. Milton Road

23                      Saratoga Springs, New York 12866

24

25

   Proceedings recorded by electronic sound recording,
   transcript produced by transcription service

2

1  (Proceedings began at 2:05 p.m.)

2          THE CLERK:  Civil Cause for Telephone Conference,

3  Docket No. 2015-CV-3086, <u>G.S. v. Congregation Lev Bais Yaakov</u>.

4          Counsel for plaintiff, please state your name for

5  the record.

6          MR. TOLCHIN:  Robert Tolchin, T-O-L-C-H-I-N, Berkman

7  Law Office, 111 Livingston Street, Brooklyn, New York.

8          THE CLERK:  Counsel for the defendant, please state

9  your name for the record.

10          MR. RUTHERFORD:  David Rutherford, Rutherford &

11  Christie for the defendants.

12          THE CLERK:  Magistrate Judge Reyes.

13          THE COURT:  Good afternoon, gentlemen.

14          MR. TOLCHIN:  Good afternoon, Your Honor.

15          THE COURT:  What is it that the defendants want?

16          MR. RUTHERFORD:  We want an authorization for the

17  cell phone records of the plaintiff.

18          THE COURT:  Mr. Tolchin indicated in one of the

19  letters that he wrote that you wanted a little more, you

20  wanted everyone in the family or something like that.

21          MR. RUTHERFORD:  I'm really concerned with the

22  infant plaintiff's records.  The reason the request is phrased

23  such as it is is it may be on a family plan in the father's --

24  in the father's name.  I'm really not interested in the

25  parents records.  I'm just interested in getting to the girl's

3

1   records and I just thought that because it might be a family

2   plan that was the way to go about it.

3               THE COURT:  What is it that you hope to get on the

4   records?

5               MR. RUTHERFORD:  Well, as Your Honor will recall,

6   this is a case about an alleged inappropriate picture that was

7   sent electronically and found on another boy's phone.  The

8   plaintiff denies having sent that and then had destroyed the

9   telephone and can't remember her number or the carrier.  And

10  so we want to find -- we want the records.  We believe that

11  the text records will help us to try and undermine that

12  statement.

13              MR. TOLCHIN:  I'm sorry.

14              THE COURT:  Mr. Tolchin, you'll get a chance.

15              MR. TOLCHIN:  No, no, no.  I just thought that we

16  got cut off.

17              THE COURT:  No, no, no.  I'm here.  I'm just

18  thinking.  I'm just wondering whether text records are going

19  to get you what you think is [inaudible].

20              MR. RUTHERFORD:  They may.  Unfortunately like Tom

21  Brady, the phone was destroyed.  So if we had the phone we

22  could have someone go in and see what's in the phone but

23  that's not available to us any more.

24              THE COURT:  What are the text records going to

25  indicate?

4

 1          MR. RUTHERFORD:  The fact that there's a very

 2    limited number of boys who this plaintiff would have been

 3    texting and if somehow a boy came in possession of a naked or

 4    a half naked picture of the plaintiff.  Now, he says he got it

 5    from another boy.  So what I'm hoping to show is text from a

 6    boy and then run down with that boy whether he received and

 7    take such a picture and in fact --

 8          THE COURT:  Let me ask you something.  How are you

 9    going to find out the gender or the identity from text

10    records?

11          MR. RUTHERFORD:  This is a very -- a couple of --

12    there's a couple of ways but [inaudible].  This is a very

13    close knit community where everybody -- it's an Orthodox

14    community where everybody knows everything about everybody

15    else.  In fact, Mr. Tolchin told me some things about my own

16    clients before I heard about it.  One of my client's relatives

17    died.  He knew that before I knew it.  So I think that my

18    client is going to be able to eliminate most if not all of

19    these phone numbers and narrow it down to a very few people

20    which we'll be able to figure out by checking with other

21    people in the community or other children and seeing if we can

22    identify who the boys are.

23          I don't think [inaudible] contact every single

24    person on the call list although I don't think -- if this

25    plaintiff is like my children they don't call very many

1   people.  So I'm hoping to run it down that way.  I've been

2   hampered because I don't have access to the phone which was

3   thrown out.

4           THE COURT:  Thrown out pre-lawsuit?

5           MR. RUTHERFORD:  [Inaudible] pre-lawsuit but after

6   all these events and certainly after the importance of it.  I

7   mean I'll probably have a spoilation motion at some point but

8   that --

9           THE COURT:  I don't know about that if it was thrown

10  out pre-lawsuit.

11          MR. RUTHERFORD:  That can be debated in another

12  forum.  I'm not here to debate spoilation.  I think given the

13  broad nature of discovery and given the fact that the phone is

14  no longer available I'm using the next best thing [inaudible -

15  coughing].  It's not -- my client is [inaudible] which caused

16  it.  It's the throwing out of the phone which caused it.

17          THE COURT:  But let's go back to the phone records.

18  So you'll get -- you'll get who she was -- the telephone

19  numbers that she was in contact with whether by telephone

20  call, [inaudible] call or text.

21          MR. RUTHERFORD:  Right.  And I'm most concerned

22  about the texts.

23          THE COURT:  Will you get whether, from those records

24  whether there was an attachment to the text or whether it

25  was --

1          MR. RUTHERFORD:  Yes, yes.  That's what typically

2    accompanies it, is a picture next to it.

3          THE COURT:  How do you know that?

4          MR. RUTHERFORD:  Because I've seen them before in

5    other cases.

6          THE COURT:  They don't even know the carrier that

7    they were using at the time?

8          MR. RUTHERFORD:  Or her number believe it or not.

9          MR. TOLCHIN:  Your Honor, if I [inaudible]

10   interject.

11         THE COURT:  [Inaudible] don't know the carrier or

12   the number what -- how are you going to get any records?

13         MR. RUTHERFORD:  There are not that many telephone

14   carriers out there but we can send them to all the cell phone

15   carriers.

16         THE COURT:  But without a telephone number --

17         MR. RUTHERFORD:  Frankly, Your Honor --

18         MR. TOLCHIN:  I can answer that directly.

19         THE COURT:  Mr. Tolchin, you'll get a chance.  Just

20   hold off.

21         MR. RUTHERFORD:  Frankly, Your Honor, I find it

22   incredulous that they can't remember who the carrier is from

23   2013 and I think faced with a court order we'll get it an

24   authorization.  I mean I think what's going on is they're

25   hiding the evidence.  I mean who doesn't -- the phone is

7

1    thrown out, I don't remember my phone number, I don't remember

2    the carrier.  Are you kidding me?  That's not plausible and

3    this is a blatant attempt to avoid production of discovery.

4              THE COURT:  Mr. Tolchin, why don't you tell me what

5    your argument --

6              MR. TOLCHIN:  First of all, what I was trying to

7    correct is that although at the deposition, at the time of the

8    deposition they both testified, the father and daughter, that

9    they did not recall the phone number or the carrier.  Since

10   this issue was raised with the Court I actually did run it

11   down and you'll see in my letter to the Court [inaudible] the

12   way I ran it down was I pushed my clients to say well, which

13   carriers could it have been and let's call the carriers and

14   ask did I have an account.  So I figured it out.  One is AT&T.

15   I even know the phone number.  So if it comes to it know the

16   girl's phone number.  She didn't know it at the deposition but

17   we got it from AT&T.

18             So in terms of accusations of hiding the ball or

19   varying evidence that really is unappreciated particularly

20   since in my letter to the Court I stated it was AT&T so what

21   am I hiding.

22             MR. RUTHERFORD:  I'm not accusing you, Mr. Tolchin,

23   of hiding it.  I'm talking about your client.

24             MR. TOLCHIN:  Your Honor, I think defense counsel

25   should have been a little more forthright with the Court on

8

1 that.  So I'll leave that alone.

2         What counsel is saying is that he wants to take my

3 client's phone bill or phone record obtained from -- get an

4 authorization or a subpoena on AT&T.  In his demand he wants

5 to do this from 2012 to the present.  So I don't know what

6 [inaudible] matters.  I don't know why that is being

7 requested.

8         MR. RUTHERFORD:  I don't need that.  If that says

9 that I will correct that.

10         MR. TOLCHIN:  I brought that up in my letters.  I

11 don't know why that's --

12         MR. RUTHERFORD:  We can down that road, why did you

13 serve that?

14         MR. RUTHERFORD:  I didn't serve it.  My associate

15 who is not here --

16         THE COURT:  Wow, wow.  You're blaming it on your

17 associate?

18         MR. TOLCHIN:  I'm not blaming anything.  You asked

19 why I did that.  What I'm saying is --

20         THE COURT:  Whether it's your associate or you it's

21 your law firm.  Your law firm is of counsel to the defendants.

22 They're all on the hook.

23         MR. RUTHERFORD:  Of course we are.

24         THE COURT:  Don't tell me that it was my associate,

25 it was my secretary, it was a contract attorney.  You're all

9

1  in it together.

2       MR. RUTHERFORD:  I'm not saying we're not, Your

3  Honor.  You asked me for why did I do that.  I don't have an

4  answer for you.

5       THE COURT:  Fine.  Why did your firm do it?  Over

6  reaching.

7       MR. TOLCHIN:  Okay.  I raise that --

8       THE COURT:  Mr. Tolchin, speak when you're spoken

9  to.  I'm not talking to you.  I'm talking to Mr. Rutherford.

10      MR. RUTHERFORD:  What I'm really thinking is 2012 to

11 November of 2013.

12      THE COURT:  When was this supposed picture sent?

13      MR. RUTHERFORD:  The call is dated November of '13.

14 So our guess is it was sent some time within the year.  So

15 that's why we sought the records starting in November of -- in

16 2012.

17      THE COURT:  Let's say she sent it.  Your clients

18 have never seen it.  They only heard at least second hand that

19 this happened.  Let's say she sent it on her own time.  So

20 what?  Why does that give them the right to [inaudible]?

21      MR. RUTHERFORD:  Because it's a violation of the

22 school's policies toward the students.

23      THE COURT:  What policy?

24      MR. RUTHERFORD:  We're dealing with an Orthodox

25 community and there is an anti technology rule and believe it

10

1  or not this is a school where when you come to school they

2  take away your cell phones.  They're only allowed to have cell

3  phones during -- when they're coming to school for safety

4  reasons.  The cell phones are then examined by a technology

5  person because people who go to that school they think that

6  the internet is bad and they don't want people on the

7  internet.  They don't want the communication between boys and

8  girls that could lead to things like this.  In fact, the

9  plaintiff had been suspended on a prior occasion for violation

10  of the technology rules.

11          THE COURT:  What is the technology rule?  Where is

12  it written and what does it say?

13          MR. RUTHERFORD:  It's written in the student

14  handbook.

15          THE COURT:  That has been produced?

16          MR. RUTHERFORD:  Yes.

17          THE COURT:  Do you have that, Mr. Tolchin?

18          MR. TOLCHIN:  Yes.

19          THE COURT:  What should it say?  What does the

20  technology rule say, you can't ever use a cell phone any time

21  at night when you're home?  What does it say?

22          MR. TOLCHIN:  Who are you asking, Your Honor?

23          THE COURT:  Anyone.  I mean you both have it so you

24  both should know what it says.  I'm just wondering.

25          MR. TOLCHIN:  The rule is more -- it's not against

1  cell phones.  It's against smart phones but [inaudible].

2          THE COURT:  But they would say that they can't have

3  them on their own time or that they just cannot use them while

4  they're at school?

5          MR. RUTHERFORD:  Phones that can go on the internet

6  or --

7          MR. RUTHERFORD:  They're not supposed to be --

8          THE COURT:  Or phones in general?

9          MR. RUTHERFORD:  No, no.

10          THE COURT:  Is there a rule -- what [inaudible] says

11  bla, bla, bla, bla, whatever it is.  What does it say?

12          MR. TOLCHIN:  Because I think that's crucial in this

13  case because if she said whatever she said on her own time and

14  that doesn't violate the rule they had no grounds to expel

15  her.

16          MR. RUTHERFORD:  The thing is, Judge, that the -- by

17  their testimony the expulsion was not because of violating the

18  rule of having a phone.  Yes, the previous school year she was

19  suspended for being -- because she brought an iPhone to school

20  but that was over and done with it.  Everyone would testify

21  that's what the expulsion was because of this alleged episode

22  of sending the picture.

23          THE COURT:  Well, what did -- let's assume that she

24  did, how did that violate the school's policy?

25          MR. RUTHERFORD:  In the testimony of Mr. Deutsche,

1   the executive director of the school who's the one who made

2   the decision to terminate her, she believes that having a girl

3   who would do such a thing is -- has the danger of his words

4   infecting 160 other girls in her grade or in her school. He's

5   worried about infecting the other kids.  So he made a

6   decision.  I quoted the testimony.  He no idea what the

7   picture was but he believed that his principal that took the

8   call believed this mother that her son said that another boy

9   said that this was the plaintiff.  I think that's five layers

10  of hearsay.

11          Do you want to know what the rule is?  I can read

12  it.

13          THE COURT:  Did he cite to whether there is a rule

14  or not?  Did he cite to anything in the student handbook or

15  some other policy of the school that was established at the

16  time that she [inaudible], at his deposition, a written

17  interrogatory, anything?  I'm just trying to get a sense

18  because I just want to know why they did this and if it's a

19  valid reason or it was just [inaudible].

20          MR. RUTHERFORD:  Well, can read what the rule says,

21  Your Honor.

22          MR. TOLCHIN:  [Inaudible]

23          THE COURT:  Let Mr. Rutherford read the rule.

24          MR. TOLCHIN:  Okay.

25          MR. RUTHERFORD:  There's a page of introductory part

1   but the portion we're talking about:  As per the use of

2   technology in general both at home and in school please keep

3   the following in mind.  Technology can indeed be used as a

4   valuable tool in many instances.  However, when it comes to

5   putting a steering wheel in the hands of our youth it is

6   crucial that we do everything plausible to simultaneously

7   safeguard their emotional and spiritual growth.  Parents that

8   are -- Bob, you may have to help me with this word.  Chad or

9   Shalom --

10          MR. TOLCHIN:  God forbid.

11          MR. RUTHERFORD:  God forbid not vigilant in this

12   matter making a decision that not only compromises the safety

13   of their daughters but the safety of other classmates and

14   school friends as well.  Our collective experience in

15   [inaudible] has shown that these issues will surface rather

16   quickly and it's a ripple effect is outstanding.  Ignoring

17   school rules will unfortunately put our school administration

18   in a situation that [inaudible] measures be taken that may

19   ultimately lead to suspension.

20          THE COURT:  And she was expelled, not suspended.

21          MR. RUTHERFORD:  Well, she was suspended one time

22   and this was the second time.

23          THE COURT:  So is there anything in the procedures

24   that say -- that has a progressive discipline policy?

25          MR. TOLCHIN:  They have no written procedures but I

14

1  asked all the witnesses at the deposition about the

2  disciplinary procedures and everyone agreed that discipline

3  should be incremental, that it should be -- if somebody says

4  you did something wrong you should be told what it is, you

5  should be given a chance to defend yourself.  They all agree

6  that that procedure was not followed in this case, that they

7  went -- most of the discipline is usually administered by the

8  principal.  In this case they brought it to the executive

9  director who made the decision, not the regular course, and I

10  think it's very important to also mention that just -- I think

11  it was two or three days before the expulsion they had a big

12  meeting with the parents and the principal to figure out what

13  to do with this girl.

14         There's no question she was academically challenged

15  and she was not doing well in school and it was very -- it was

16  a very tough time for her and the school needed to figure out

17  what would be a good attainable program academically that she

18  could be in, what special help, what classes, which regents

19  she would take, what she wouldn't take, and they had a big

20  productive meeting and made a plan to go forward.

21         Two or three years later they get this call and --

22         MR. RUTHERFORD:  Which is [inaudible].

23         MR. TOLCHIN:  Anything she did in the past is all

24  consumed in that [inaudible] meeting.  It was [inaudible] that

25  meeting.

1    MR. RUTHERFORD:  Your Honor, I couldn't hear what he

2  said.

3    MR. TOLCHIN:  The call, the call that this mother of

4  the boy who allegedly was called by another boy and maybe

5  someone else that she sent this picture that telephone number

6  that the call was made on was not documented or anything like

7  that.  We don't know who the person is.  We don't know what

8  their telephone number is.  So --

9    MR. RUTHERFORD:  Right.  Which is why I'm trying to

10  go from [inaudible].  Like I said, the easiest way would have

11  been to have the phone and so I don't have that and I'm trying

12  to --

13    THE COURT:  No, that's not --

14    MR. TOLCHIN:  Not her phone.  I'm talking about the

15  phone to the -- [inaudible] the school.

16    MR. RUTHERFORD:  I understand.  And I'm told --

17  believe me, I've tried this with my own client and can't -- I

18  can't figure out who called.

19    THE COURT:  Have they -- Mr. Tolchin, have you asked

20  for their phone records?

21    MR. TOLCHIN:  I did not ask for their phone records

22  but I asked at their deposition if they had gone back and

23  looked and everyone denied it.  And the principal who took the

24  call allegedly testified that she was doodling during the call

25  and she saw the number in the caller ID but she didn't write

1  it down.

2        THE COURT:  Okay.  Mr. Rutherford, if we get these

3  phone records and it -- and you look at them and it shows no

4  calls to boy -- no texts to boys, then what happens?

5        MR. RUTHERFORD:  Well then, I don't have -- I mean,

6  what I would have then if it showed that, I could run down a

7  picture, I've got the claimant lying under oath, and that's a

8  big powerful piece of evidence.

9        THE COURT:  Well, I --

10        MR. RUTHERFORD:  We know that --

11        THE COURT:  -- you're going to get the picture --

12  how are you going to get the picture from a telephone record?

13        MR. RUTHERFORD:  Well, then I've got to find -- then

14  I've got to speak to whoever has got -- whoever made the call

15  or has the text and -- you know, knowing boys, it's probably

16  still on somebody's phone.  That's why you don't send these

17  things.  I may actually be able to find an actual picture.

18        THE COURT:  And if you can't -- and if you can't

19  then --

20        MR. RUTHERFORD:  Well, if I can't, then I have to --

21  then it all comes down to the credibility of the principal

22  because the principal deemed this a credible call and in the

23  Orthodox community, the sending of a naked picture -- I mean,

24  that's like black -- that's an easy suspension or expulsion.

25  That is so beyond the pale of what this school expects from

1  people and what I've just read to you before that I'm okay

2  with arguing that but my case will certainly be a lot stronger

3  if I've got the plaintiff lying under oath.

4          And, again, this is discovery which is broad and I'm

5  seeking -- now I'm orally modifying what I sought in the -- my

6  office sought in the interrogatories which was too broad, 2012

7  to 2015 --

8          THE COURT:  Is Mr. Kinsick [Ph.] still working for

9  you?

10          MR. RUTHERFORD:  Yes.

11          THE COURT:  You should talk to him about that.

12          MR. RUTHERFORD:  Yeah.  It should have said '13.

13  2012 to November of 2013.  I don't need the records beyond

14  when she was --

15          THE COURT:  I know.  I don't know where -- why

16  November and why 2012.  We're --

17          MR. RUTHERFORD:  Well --

18          THE COURT: You want the year before the incident.

19          MR. RUTHERFORD:  Yeah.  I'm seeking to be

20  reasonable.  I'm only seeking the year before the incident.

21  It's not like I want records forever for some nefarious

22  purpose.  I just want -- I mean, I've stated why I want them.

23          MR. TOLCHIN:  Judge, can I respond to some of this?

24          THE COURT:  And -- yeah, you can, you can.  And you

25  want telephone calls or text records?

1        MR. RUTHERFORD:  I want the phone records.  If you

2   want to limit it to texts, that's fine.

3        THE COURT:  All right.  Mr. Tolchin, go ahead.

4        MR. TOLCHIN:  First thing, what counsel is asking

5   for is an unbelievable intrusion into somebody's private

6   space.  I'm astonished that it's being made without any good

7   faith showing of two things.  The first thing is what actually

8   happened [inaudible] from their own phone records.  Have they

9   contacted their phone company and gotten their call logs?  If

10  they have, it hasn't been produced, but even if you tell me

11  that you did, if the call was in the caller ID then it should

12  be on their own phone records.

13       The absence of that actually is -- it occurred to me

14  now is a pre-credibility factor in my opinion.

15       THE COURT:  Do we know the day on which this call

16  was made to the school?

17       MR. RUTHERFORD:  I'm not sure --

18       THE COURT:  Was it that day?

19       MR. TOLCHIN:  Yeah, it was the exact day.

20       THE COURT:  Okay.

21       MR. TOLCHIN:  The call came in at four o'clock in

22  the afternoon.  The next morning the parents called in for a

23  meeting and she was expelled and two hours later the principal

24  sent an e-mail to all the parents in the class defaming the

25  plaintiff.  So we contend -- we know exactly the day.

1          We have an e-mail from Mrs. Oratz to all the parents

2   saying that G.S. was expelled --

3          THE COURT:  We're going to -- that portion of the

4   transcript is --

5          MR. TOLCHIN:  Oh, I'm sorry.  I didn't realize --

6          THE COURT:  -- going to be -- for the court reporter

7   where the name was just mentioned, that is going to be

8   redacted.

9          MR. TOLCHIN:  Your Honor, I'm sorry --

10         THE COURT:  That's okay, Mr. Tolchin.  You're on a

11  roll.  Go ahead.

12         MR. TOLCHIN:  Oh.  So we know the exact date and we

13  even have Mrs. Oratz who testified that it was towards the end

14  of the day.  She had gone to Staples to buy envelopes because

15  she had to mail out some high school program applications for

16  kids.  So -- and Mrs. Sochaczewski took the call after --

17         THE COURT:  All right, good.  We know the date.

18  Good.  Good.  Move on.

19         MR. TOLCHIN:  -- [inaudible].  You continue --

20         THE COURT:  Why is Mr. Rutherford not entitled to

21  this information?

22         MR. TOLCHIN:  I'm sorry?

23         THE COURT:  Why is Mr. Rutherford not entitled to

24  your client's text records?

25         MR. TOLCHIN:  Well, the question is -- to get back

1  to what Your Honor asked, what are you going to do with the

2  information you get.  Mr. Rutherford, I think he says he has

3  some kind of magical way that he's going to look at texts -- a

4  log of text messages on a phone bill and he thinks he can

5  determine which of those texters are boys.  And then somehow

6  he's going to figure out who all those boys are and then he's

7  going to contact them and essentially say do you know G.S.,

8  did she send you any dirty pictures, and do you still have

9  them.

10          Now -- and all of this is to bolster what they did

11  without having any of this information.  The intrusion into

12  the plaintiff's world and into the plaintiff's privacy even

13  though she is in the plaintiff in a lawsuit, it doesn't give

14  them the right it seems to me to intrude into her phone bill

15  and call up everybody she knows and essentially spread rumors

16  anew in the name of discovery.  And they certainly shouldn't

17  be allowed to do that before they've looked in their own

18  records in a convincing way and [inaudible] an explanation if

19  they really got this call which I'm not even --

20          THE COURT:  No, the two aren't mutually exclusive,

21  right?  I could tell the defendants produce to the plaintiff

22  records and telephone calls received by the school for a two-

23  week period prior to G.S.'s expulsion.

24          MR. TOLCHIN:  They're not mutually exclusive

25  although since we know the -- apparently know the exact date,

1  I don't -- I think it's just -- it should be limited to that

2  date but I don't necessarily have a problem --

3          THE COURT:  Right.

4          MR. TOLCHIN:  -- with that if they have the records.

5          THE COURT:  Well, whether they have the records or

6  they're provided.

7          MR. TOLCHIN:  Yeah.

8          THE COURT:  Right?  And then I could say --

9          MR. RUTHERFORD: [Inaudible]

10          THE COURT:  Then I would say to the plaintiff sign

11  an authorization for outgoing text messages to -- from G.S.'s

12  telephone and we could figure out the time period.  I don't

13  know that a year is appropriate, maybe something shorter but

14  provider, AT&T produce the outgoing text messages.  I don't

15  think they would have the content of the --

16          MR. RUTHERFORD:  No, they don't [inaudible] --

17          THE COURT:  -- maybe they have -- whether there was

18  a file, some other sort of file associated with it but produce

19  that.

20          MR. TOLCHIN: And what are they going to do with it

21  [inaudible] --

22          THE COURT:  And then -- well, and then we can say,

23  Mr. Rutherford, before you contact anyone, you believe that

24  you have in the community, you've got ways of figuring out

25  whose number is who.

22

1          MR. RUTHERFORD:  Yeah, well, the first thing --

2          MR. TOLCHIN:  Without calling the number.

3          MR. RUTHERFORD:  -- and --

4          THE COURT:  Without --

5          MR. TOLCHIN:  Judge, I don't believe that such a

6    thing exists.

7          MR. RUTHERFORD:  Hold it.  Can I just speak for a

8    second?

9          THE COURT:  Let Mr. Rutherford explain -- let Mr.

10   Rutherford explain how he would propose finding out which of

11   those numbers are associated with individuals so we could then

12   determine -- before contacting the people who own the numbers.

13         MR. RUTHERFORD:  Absolutely.

14         THE COURT: Because --

15         MR. RUTHERFORD:  The first thing I would do -- I'll

16   tell you exactly what I'll do.  The first thing I'd do -- the

17   school has records of everyone in their class, all the people

18   who attend the school.  So we can eliminate -- and it's an

19   all-girls school.  So we can eliminate through the school's

20   records any girls or any families that have anything to do

21   with the girls school.  My guess --

22         MR. TOLCHIN:  Judge, if that's so, why didn't they

23   know my client's phone number?  Why are they --

24         MR. RUTHERFORD:  Can we --

25         THE COURT:  Mr. Tolchin, let Mr. Rutherford finish

1  his thought.

2          MR. TOLCHIN: Okay.

3          MR. RUTHERFORD:  Just to answer that question,

4  knowing the phone number doesn't give me an authorization.  I

5  need an authorization.  That's what the demand is.

6          MR. TOLCHIN:  But you don't know the number.

7          THE COURT:  No, the point is that if you don't know

8  G.S.'s telephone number then you don't know the other girls in

9  the school's telephone number so you can't go down the text

10 lines, you know, and say okay, that's S.V., that's, you know,

11 G.D., that's whatever.

12         MR. RUTHERFORD:  I didn't say I couldn't figure that

13 out.  What I said was she testified she couldn't remember

14 doing anything like that.  I hadn't undertaken a search for a

15 phone number because it doesn't do me any good without an

16 authorization.  All I did was make a request for an

17 authorization for the cell phone records.  That's a very

18 simple request which I've probably made in 50 cases over the

19 years and never had this type of problem before.

20         But, be that as it may, I believe I can eliminate a

21 huge percentage of those numbers and narrow it down.  Then

22 let's say I've narrowed it down to ten numbers.  There's a

23 boys school or there's boys schools -- it's a closed-knit

24 community; maybe some people can recognize the number.  I have

25 no interest, trust me -- first of all, they don't trust people

1  who call randomly so I have no interest in randomly trying to

2  call people and somehow besmirch her reputation.  I think I'm

3  going to be able to narrow it down to two or three people.

4  That's my hope.

5          MR. TOLCHIN:  So, Your Honor, here's what I'm

6  hearing.  I'm hearing that he has no real way to look these

7  up.  There's no directory --

8          MR. RUTHERFORD:  No, I can do that too.

9          MR. TOLCHIN:  He is guess -- I gave him a challenge.

10 I gave him three numbers and said tell me whose numbers these

11 are.  He didn't take me up on that.

12         MR. RUTHERFORD:  Well, I don't work for Mr. Tolchin

13 and I don't take --

14         MR. TOLCHIN:  Right.  If you want proofs, challenge

15 it --

16         MR. RUTHERFORD:  I don't have to prove anything --

17         MR. TOLCHIN:  Your Honor --

18         THE COURT:  Gentlemen, gentlemen.  Gentlemen,

19 gentlemen, gentlemen.  Gentlemen, stop talking -- just stop

20 talking for a second.  Just stop talking for a second.  This

21 is not personal so you both need to step back.

22         I've got the growing sense from dealing with this

23 case from the outset that there -- you know, the lawyers are

24 getting issues with each other, you know, so let's just cut it

25 out.  It's so draining dealing with it.  Let's figure out how

25

1  to get to the bottom of this and save our clients money and

2  time and get to the merits.

3          MR. RUTHERFORD:  Sure.

4          THE COURT:  And someone is going to -- at the end of

5  the day, someone is going to be incredibly unhappy with the

6  outcome unless you settle the case.  All right.  So, you

7  know -- so -- all right.  So you will take this list of texts

8  and then you will --

9          MR. RUTHERFORD:  I will narrow it down --

10          THE COURT: Also --

11          MR. RUTHERFORD:  -- to find people and then we'll

12  try and trace whatever numbers I can trace.  I don't want to

13  trace -- let's say there's 50 numbers.  I don't want to trace

14  50 numbers.  What I can eliminate very easily from school

15  records I will do that.  Then I will trace the numbers that --

16  the few numbers I have and if I can't figure that out by

17  trace, I'm guessing there's only going to be two or three

18  numbers, I'll have to call them again.

19          THE COURT:  How can you do this without your clients

20  looking at the list?  Because I'll be very blunt, I don't

21  trust them.  And here's why I don't trust them.  Because they

22  relied on an anonymous tip without following it up.  They shot

23  from the hip.  I have no doubt that they'll shoot from the hip

24  again; if they see a list of numbers, they'll start calling

25  it.  They'll go rogue.

1        MR. RUTHERFORD:  Well, if you want --

2        THE COURT:  And that's not happening.

3        MR. RUTHERFORD:  Okay.  If Your Honor wants --

4        THE COURT:  How can you [inaudible] client seeing

5    the list?

6        MR. RUTHERFORD:  Okay.  If Your Honor wants us to do

7    that, I can do that.  We'll start with the class that she was

8    in.  We'll ask -- we'll go over to the school.  They must have

9    a record of all the parents and, you know, fill out the forms

10   where they give everybody numbers and if you want an attorney

11   to do it from my firm, I'm happy to do that.  I just want to

12   move on and get this case to the end of discovery.

13       THE COURT:  All right.  I want -- I want -- it is

14   certainly attorney's eyes only.

15       MR. RUTHERFORD:  Okay.

16       THE COURT:  And before you call anyone on that list

17   that you identify as a possible recipient of --

18       MR. RUTHERFORD:  Text.

19       THE COURT:  -- a text with -- well, it's more than a

20   text.  It's kind --

21       MR. RUTHERFORD:  A text picture.

22       THE COURT:  -- got to be the naked picture --

23       MR. RUTHERFORD:  Right.

24       THE COURT:  -- partially clothed, whatever.  You

25   have to establish to me for my -- for me that that is a likely

27

1   suspect.

2           MR. RUTHERFORD:  Fair enough.

3           THE COURT:  You know, this is Joe Smith.  The

4   records say he got a text from G.S. with an attached file.

5   And I'd like to check to see if this is the deal.

6           MR. RUTHERFORD:  Fair enough.

7           THE COURT:  All right?  I'm also -- so plaintiff

8   will sign an authorization for that number Mr. Tolchin

9   indicated, AT&T.  I'm going to give you six months, six months

10  prior to the incident.

11          MR. RUTHERFORD:  Well, here's my only concern with

12  that, Your Honor.  If the testimony is that he got it from

13  somebody else and that's why we asked for a year, can we go

14  with nine months as a compromise?

15          MR. TOLCHIN:  The testimony, Your Honor, was that

16  the boy said that his -- that the mother said that the boy

17  said that this was G.S., Lev Bais Yaakov, tenth grade.  That

18  was the claim.  So this was December --

19          THE COURT:  And the picture was on the boy's cell

20  phone.  And the mother deleted it because the father is a

21  lawyer and said that that's child porn.

22          MR. TOLCHIN:  Correct.  Correct.  Allegedly.

23          THE COURT:  All right.  Fine, I'll give you nine

24  months.

25          MR. TOLCHIN:  Okay.

28

1          THE COURT:  But as a quid pro quo because discovery
2     is a two-way street, the school is going to sign an
3     authorization for its telephone provider, you know, whoever it
4     is, for all calls placed to the school.
5               Now, I was going to say two weeks but Mr. Tolchin,
6     tell me about this.  They had a meeting about her academic
7     issues when?
8          MR. TOLCHIN:  Just a couple of days before.
9          THE COURT:  The expulsion.  Okay.
10          MR. RUTHERFORD:  But there's no window.  I mean, if
11     this happened --
12          MR. TOLCHIN:  We know the day it happened on.
13          MR. RUTHERFORD:  We know the date and time.  We know
14     the date and within an hour of the time.
15          MR. TOLCHIN:  So why shouldn't the authorization be
16     any broader than that?
17          THE COURT:  Well, because people's memories are --
18     --
19          MR. TOLCHIN:  No, because it's not really a memory
20     issue because they -- the family was called in the very next
21     morning.  We know that --
22          THE COURT:  Right.
23          MR. TOLCHIN:  -- and we know the date that the
24     family was there.  It's not a matter of memory.  Everybody
25     agrees on the date.

1        THE COURT:  I'll give you a week.  I understand --

2   you know, everybody may agree that when the family was called

3   in and all that but the person who got the call made the

4   mistake; it might have been not the day before but two days

5   before and for whatever reason --

6        MR. RUTHERFORD:  Then it would have been a weekend.

7        MR. TOLCHIN:  Yeah.  It was on a Monday.  It doesn't

8   make any sense that it's anything but that day, Your Honor.

9        THE COURT:  Fine.  Do it a week.  Attorney's eyes

10  only, Mr. Tolchin.  You'll look at it, and you -- I don't know

11  what you can do with that but --

12       MR. TOLCHIN:  I don't know.

13       THE COURT:  I mean --

14       MR. RUTHERFORD:  -- [inaudible] there was no phone

15  records.

16       THE COURT:  Maybe they didn't get any calls.

17       MR. RUTHERFORD:  I was always taught not to ask a

18  question if you don't know the answer.

19       THE COURT:  Well, even if there's a record -- let's

20  say ten people call the day -- on that Monday or three people

21  called after four p.m. which was when the call happened,

22  right?  So you've got a record of that.  If you didn't have

23  the records, you still have the testimony of the principal who

24  got the call, right?

25       MR. TOLCHIN:  Uh-huh.

1    MR. RUTHERFORD:  Well, they would have to come to

2 court, for what it's worth.  Not for the truth of the matter

3 asserted but for the fact that she got a call.

4    THE COURT:  But if you -- let's say there are no

5 calls after four o'clock.  Let's say there are none.  You say

6 you got a call, look [inaudible].  You're a dirty liar.  You

7 cooked this whole thing up to get her out of the school.  It

8 can go one way or the other, right?

9    MR. RUTHERFORD:  What we won't eliminate is the very

10 real possibility which is frankly what I believe happened that

11 somebody pranked the school.  Somebody pranked the school --

12    THE COURT:  Well, then --

13    MR. RUTHERFORD:  -- and pranked the girl.

14    THE COURT:  If somebody pranked the school then

15 there may be a third-party liability here.  If that -- or

16 well, whether somebody pranked the school or a kid got caught

17 with something and placed the blame elsewhere, right?

18    MR. RUTHERFORD:  Yep.

19    THE COURT:  But if that's the case that's not the

20 school's fault, right?  I mean, the school can be faulted for

21 not following up and not -- you know, on an anonymous call

22 taking the drastic measure of expelling someone.  Even with --

23    MR. TOLCHIN:  Your Honor --

24    THE COURT:  -- [inaudible].  That's -- you know --

25    MR. TOLCHIN:  The same handbook, the same handbook

1   that Mr. Rutherford quoted from also says that everyone who

2   goes to this school agrees with umshtemik values.  Umshtemik

3   values means the religious outlook values of the school, and I

4   asked the people from the school what were those umshtemik

5   values of the school, one of them was guarding your top [sic],

6   that means don't gossip, and they all agree about the Jewish

7   rule about not gossiping also includes not listening to gossip

8   and not believing gossip that you hear about other people.

9   All they've given people the benefit of the doubt.  That's one

10  of their foundational principles.  Yet this anonymous call

11  from an anonymous person with a secondhand story from a boy,

12  that they believe right away, you're out of school the next

13  morning, and Mr. Rutherford complains that my client got a new

14  phone and doesn't have her old phone.  Why didn't they look at

15  her phone to call the family the next morning, tell the girl

16  show me your phone right then and there.

17          THE COURT:  All right.

18          MR. TOLCHIN:  They didn't ask, and now Mr.

19  Rutherford wants to say that two years later, he can look back

20  in the phone and find the picture -- a text message from --

21          THE COURT:  Okay.

22          MR. TOLCHIN:  -- two years ago.  Come on.

23          THE COURT:  I hear what you're saying, Mr. Tolchin,

24  and you may be right at the end of the day but I have a 2:30

25  telephone conference that's waiting and I have a three o'clock

1  after that so I'm all backed up.  I want you each to give the

2  authorizations to your adversaries and subpoena the records

3  and go forward as I indicated.  Mr. Rutherford, before you --

4  it's -- all of this is attorney's eyes only.  Before you call

5  anyone, take any action, you know, double back with me and

6  we'll figure out how best to go forward --

7         MR. RUTHERFORD:  Your Honor, doesn't that --

8         MR. TOLCHIN:  Your Honor, logistically, do I have --

9  do we have to do this by giving an authorization or it would

10  be it -- if I --

11         THE COURT:  I don't care.  I don't care.

12         MR. RUTHERFORD:  I want an authorization.

13         MR. TOLCHIN:  No, maybe if I get -- if I get a

14  printout from AT&T --

15         MR. RUTHERFORD:  No, I want an authorization and the

16  second point is I am prohibited from making any calls without

17  checking with Your Honor.  I would like the same to be applied

18  to Mr. Tolchin, not making any calls without checking with

19  Your Honor.

20         THE COURT:  Two-way street.

21         MR. TOLCHIN:  Fine.

22         THE COURT:  All right.  Look, Mr. Tolchin, if Mr.

23  Rutherford insists on an authorization and subpoenaing the

24  records, you know, indicates to me he doesn't trust you or

25  your client so that's fine, you know.

33

1        MR. TOLCHIN:  I just thought it would be more

2  expeditious.

3        THE COURT:  Well, you know, perhaps it would be but,

4  you know, he is well within his rights to ask for it and, you

5  know, to -- what is the famous saying from President Reagan

6  "Trust but verify."  Who's to verify.

7        MR. TOLCHIN:  That's fine.

8        MR. RUTHERFORD:  I think President Reagan it was

9  contra what, who.

10        THE COURT:  But, look, gentlemen, I'm going to bring

11  this back in two minutes if that.  This case needs to be

12  resolved.  It's going to end up in a very difficult place for

13  someone, and there's no way we can resolve this?

14        MR. RUTHERFORD:  I'm always open to that.  I have

15  a -- frankly a demand that has shocks the conscience.  So --

16  but I'm always willing to talk and despite the fact that, you

17  know, we argue in front of Your Honor, I actually think we get

18  along pretty well and the issues are not -- what we have

19  disputes on are actually very few.

20        MR. TOLCHIN:  I will tell Your Honor that I have

21  never heard and I'm sure Your Honor has never heard of a

22  defendant who thought that a plaintiff's demand, at least his

23  opening demand didn't shock the conscience.  I also have no

24  problems getting along with Mr. Rutherford.  The same can't be

25  said about Mr. Kinsick but that's a different story.

34

1          THE COURT:  All right.  Well, maybe with my -- maybe

2  I'm projecting with Mr. Rutherford issues that you hadn't with

3  Mr. Kinsick but look, keep it civil, work together, and if you

4  need my help settling the case, I'm here but you've got to

5  make some movement.  You've got to get somewhat close because

6  I'm not a miracle worker.

7          MR. RUTHERFORD:  Thank you, Your Honor.

8          THE COURT:  All right.  I will speak to you whenever

9  we're set to have another conference but make sure that you

10  get --

11          MR. TOLCHIN:  It's like in ten days, isn't it? is it

12  ten days?

13          THE COURT:  Is it ten days?

14          MR. TOLCHIN:  It's in early February.

15          MR. RUTHERFORD:  Yeah, it's in February.  I can give

16  you the exact date if you want.

17          THE COURT:  Why don't you look at the schedule and

18  see if you need to adjust it --

19          MR. RUTHERFORD:  We're to be in front of Your Honor

20  on the 9th.

21          THE COURT:  No, that doesn't make sense.

22          MR. RUTHERFORD:  No.

23          MR. TOLCHIN:  Judge, I mean --

24          THE COURT:  I mean, if that's the date but I don't

25  see why we should meet if you still have these issues and

35

1  you've got to get information.

2          MR. TOLCHIN:  Correct.

3          THE COURT:  All right.  So why don't you -- I really

4  don't want to get into what else remains to be done but why

5  don't you talk to each other and figure out what needs to be

6  done and how to adjust the schedule.

7          MR. TOLCHIN:  We will.

8          THE COURT:  And send me a letter --

9          MR. RUTHERFORD:  And all of -- there's no

10 outstanding issues other than this.

11         MR. TOLCHIN:  Well, why don't we talk, Robert, and

12 we'll -- I know the Magistrate has two calls he's got to go to

13 so --

14         MR. RUTHERFORD:  Right.  We have -- we reached their

15 discovery end dates and there's no open issues, nothing else

16 is teed up.  As far as I'm concerned, discovery is over other

17 than this.

18         MR. TOLCHIN:  Like I said, we'll meet and confer and

19 get back to Your Honor.

20         THE COURT:  Meet and confer.  I'd like a status

21 report by Thursday --

22         MR. TOLCHIN: Which day?

23         THE COURT: -- telling me what remains to be done and

24 we'll adjourn the February 9th conference and I'll see a

25 status report on Thursday, the 4th.  All right.  Yeah.

36

1          MR. TOLCHIN:  Correct.

2          THE COURT:  And I'll figure out where we go from

3    there.

4          MR. RUTHERFORD:  Thank you, Your Honor.

5          THE COURT:  Thank you, gentlemen.

6          MR. TOLCHIN:  All right.  Bye.  Thank you.

7    (Proceedings concluded at 2:55 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

1     I, Shari Riemer, certify that the foregoing is a true and

2 correct transcript from an electronic sound recording of the

3 proceedings in the above-entitled matter and that the

4 transcript page format is in conformance with the regulations

5 of the Judicial Conference of the United States.

6

7                Dated this 3rd day of May, 2016

8

9

10               _____

11                   Shari Riemer

12

13

14

15

16

17

18

19

20

21

22

23

24

25